IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOSEPH WEST, *et al*.,                                )
                                                                     )
         Plaintiffs,                                          )
                                                                     )
v.                                                                   )    Case. No: 2:18-cv-1061-RAH
                                                                     )                  [WO]
BUTLER COUNTY BOARD                             )
OF EDUCATION, *et al*.,                              )
                                                                     )
         Defendants.                                         )

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

Plaintiffs Joseph West, Margaret West, Regina Bennett, Willie Thornton, Lenicki Moore, and Shawnda Bell are six of over twenty current and former employees of the Butler County Board of Education who were selected for transfers and reassignments in early 2018 as part of a restructuring process initiated by a newly hired school district superintendent. According to these six Plaintiffs, the decisions to transfer or reassign them were based on their race and in violation of their due process rights. Pending before the Court are joint motions for summary judgment filed by Defendants against all Plaintiffs.[1] For the following reasons, all

---

[1] Plaintiffs name the Butler County Board of Education, board members Linda Hamilton, Mickey Jones, Michael Nimmer, Lois Robinson, and Brandon Sellers, and Superintendent Joseph Eiland as defendants.

of the motions except for that of Plaintiff Shawnda Bell are granted in full. Bell's

motion is granted in part and denied in part.

## II.     JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331. The parties do not

contest personal jurisdiction or venue, and there are adequate allegations to support

both. *See* 28 U.S.C. § 1391.

## III.    FACTUAL BACKGROUND

### A. Personnel Moves

In February 2017, the Butler County Board of Education (BCBOE or the

Board) hired Dr. John Strycker as its new superintendent to revitalize its purportedly

failing school district. Strycker took over the superintendent role in July 2017 after

the school district received a "D" on the 2016-2017 State Report Card by the

Alabama State Department of Education (ASDE). (Doc. 156 at 3; Doc. 162-10 at

40; Doc. 164-2 at 41; Doc. 165-8 at 63–68.) According to board member and

defendant Linda Hamilton, the Board wanted someone who could "take a whole new

look at the system and come up with recommendations to move us forward" (doc.

164-7 at 116), to address the district's poor financial situation, and to "put the

necessary people in place to help us with our meeting State standards," (doc. 164-7

at 117).

The school district consisted of its Central Office and six schools: W.O. Parmer Elementary School (K-2), Greenville Elementary School (3-4), Greenville Middle School (5-8), Greenville High School (9-12), including its career tech academy, Georgiana School (K-12), and McKenzie School (K-12).

Before he started work, Strycker researched the district and developed several areas of concern, including low student proficiency levels, particularly in special education (doc. 167-1 at 77–78, 146–47, 186); low curriculum scores (doc. 167-1 at 154); inadequate recordkeeping which could result in state intervention (doc. 165-8 at 171); and poor district finances (doc. 168-4 at 57). Accordingly, Strycker believed staffing changes were necessary. (Doc. 165-8 at 171–72.)

Once hired, Strycker also sought to transfer, or have retire, numerous employees—black and white, male and female. For example, Catherine Tanner (white female), the principal at Greenville Middle School, was asked to retire as principal, which she did. (Doc. 165-8 at 158–59.) Tanner was replaced as principal by Bryant Marlow (black male), who had been the principal at Georgiana. (Doc. 165-8 at 159.) Marlow's former principal position at Georgiana was filled by Curtis Moorer (black male). (Doc. 168-11 at 179.)

Further, just days after arriving, Strycker hired Joe Eiland (white male) and Lisa Adair (white female) as administrative assistants in the Central Office.

Plaintiffs Margaret West (black female), Shawnda Bell (black female), Lenicki Moore (black female), and Regina Bennett (black female), were all long-term employees and current guidance counselors who were selected for personnel moves. Ms. West, Bell, and Moore were to be transferred to different schools within the district, and Bennett was to be reassigned to a different position within the same school. (Doc. 158 at 5–6.) Tomesha Hamilton (black female), Charles Todd Henderson (white male), Tonya Coker (white female), and Haden Horton (white female) were not transferred, although Strycker sought to transfer Horton but purportedly relented after Horton's school principal objected. (Doc. 165-8 at 192–93; Doc. 167-12 at 279–80; Doc. 168-1 at 295; Doc. 175-1 at 3.)

**<u>Margaret West</u>**: Ms. West, the guidance counselor at Greenville Middle School who had formerly held positions as a teacher, counselor, and assistant principal, was notified that she was swapping positions with Bell, a district-wide career tech counselor. (Doc. 162-3 at 86–87.) Although she would not have suffered any change in her compensation and although she acknowledges the career tech position was no less prestigious, Ms. West claims the new position would have been more stressful because of the complex and broad duties involved and because it would have required her to travel three additional miles to work every day. (Doc. 162-3 at 68, 83–85, 87–88.) Ms. West nevertheless decided to retire rather than assume Bell's career tech position. (Doc. 162-3 at 46, 84, 88.) After Ms. West's

decision to retire, Bell's former position was filled by Briana Hunter, a white female. (Doc. 185-76.)

**Bell:** Bell was to be transferred to the guidance counselor position held by Margaret West. (Doc. 164-2 at 145–46.) Although Jennifer Burt (the career tech director and Bell's supervisor) opposed this move (doc. 178-2), the transfer was made for the stated reason of "maximizing personnel resources within the district," (doc. 164-2 at 104). Bell's transfer did not result in a loss of pay, although Bell claims there was a loss of responsibility and prestige. (Doc. 164-2 at 110–11.)

**Moore**:  Moore, a counselor at Georgiana who previously held positions as a third-grade teacher and reading coach, was notified of her transfer to a counselor-teacher position at W.O. Parmer. (Doc. 163-8 at 48; Doc. 175-1 at 3–4.) According to Defendants, Moore was transferred to maximize personnel resources because her principal did not believe she was meeting expectations. (Doc. 158 at 6; Doc. 163-8 at 64–65.) Other than the loss of a $1,500 coaching stipend at Georgiana (doc. 163-8 at 65), Moore suffered no change in compensation (doc. 163-8 at 65). Allison Hall, a black female, filled Moore's former counselor position at Georgiana. (Doc. 154-10 at 4.)

**Bennett**: Bennett was reassigned within W.O. Parmer from guidance counselor to kindergarten teacher. (Doc. 162-10 at 33–34, 40–41.) Lenicki Moore took Bennett's former position. (Doc. 159 at 11.) While Bennett suffered no change

in compensation, she believed her future job advancement prospects were harmed and that she was transferred to a less prestigious position that had less student impact. (Doc. 162-10 at 33; Doc. 183-1 at 25–26.)

Bennett was given no reason for her reassignment (doc. 162-11 at 9), but the reassignment occurred shortly after a series of disagreements between Bennett and her principal, Jacqueline Thornton (black female), who Bennett had previously accused of harassing her, (doc. 154-9 at 3–5; doc. 162-10 at 47–48, 53, 158–60).

The other two Plaintiffs—Willie Thornton (black male) and Joseph West (black male)—were transferred from the Central Office to two schools in the district.

**W. Thornton**: W. Thornton was transferred from the special education coordinator position at the Central Office to the special education teacher position at Greenville High School. (Doc. 178 at 3, 6.) The reasons given to Thornton for his transfer were "projected financial reasons and Central realignment of duties." (Doc. 163-3 at 6.) Shawaungela Bolden, a black female, filled Thornton's position. (Doc. 154-8 at 7.) Thornton experienced no change in compensation due to his transfer, although he believes the new position constituted a loss of prestige. (Doc. 160 at 14.)

**Joseph West**: Joseph West was transferred from an administrative assistant for operations position in the Central Office to an assistant principal position at W.O. Parmer. (Doc. 162-1 at 99–105; Doc. 182 at 3.) This transfer came after Mr. West refused a buyout offer. (Doc. 162-1 at 133–34; Doc. 182 at 5.)  Like with Thornton,

the stated reasons for Mr. West's transfer were "projected financial reasons and Central Office realignment of duties." (Doc. 162-1 at 365.)

Mr. West's position was filled by Donna Ash, a black female. (Doc 168-11 at 400.) Mr. West suffered no change in compensation. However, Mr. West considered the transfer a demotion since he would perform fewer supervisory duties and more menial tasks like "lunchroom clean up duty, lifting textbooks, bus duty, and light administrative tasks." (Doc. 162-1 at 135–36; Doc. 182 at 10–11.)

## B. Meetings of the Butler County Board of Education

Before the moves were made and approved by the Board, the Board gave those employees who were to be transferred an opportunity to object before the Board at a meeting. Some of them did. Others did not. During its May 15 and May 31, 2018, board meetings, the Board considered and voted on twenty personnel actions in total. (Doc. 154-8 at 5.)

Pursuant to Board Policy dealing with internal reassignments within the same school, Bennett was not allowed to speak at the meeting. (Doc. 154-8 at 5; Doc. 154-9 at 5.)

Since Joseph West had failed to make a timely request to appear before the Board (doc. 162-1 at 73), he also did not appear, (doc. 162-1 at 82–84). In his absence, the Board approved his transfer on May 31, 2018. (Doc. 161 at 5.)

Moore, Ms. West, Bell, and Thornton contested their transfers before the Board but were unsuccessful. (Doc. 156 at 12; Doc. 157 at 6; Doc. 160 at 13; Doc. 162-3 at 50–52; Doc. 163-1 at 95–96; Doc. 163-8 at 70–71.) Thornton and Moore appealed their transfers to an administrative law judge (ALJ), arguing that the Board hearing provided insufficient due process. (Doc. 158 at 6; Doc. 160 at 14; Doc. 163-1 at 96.) The ALJ upheld both transfers, finding that Thornton and Moore were afforded adequate process. (Doc. 158 at 6; Doc. 160 at 14; Doc. 163-1 at 107–08.)

Ms. West decided to retire instead of accepting her transfer. (Doc. 164-2 at 250.)  Due to Ms. West's decision to retire and the resignation of the career tech director, Jennifer Burt, a representative at the Central Office discussed with Bell the possibility of returning to her former career tech counselor position. (Doc. 164-2 at 250–52.)  Bell declined the offer, citing an insufficient salary. (Doc. 164-2 at 292–94.)

## IV.   CLAIMS

Although vague in several places, the Complaint contains the following claims:[2]

- Count I: Title VII - Race discrimination by Joseph West

---

[2] To the extent Plaintiffs bring § 1981 claims in the Complaint in Counts VII and VIII, they concede in briefing that those claims should "proceed through" their § 1983 claims. Therefore, the Court considers them together.

- Count II: Title VII - Race discrimination by Margaret West

- Count III: Title VII - Race discrimination by Shawnda Bell

- Count IV: Title VII - Race discrimination by Regina Bennett

- Count V: Title VII - Retaliation by Regina Bennett

- Count VI: Title VII - Hostile work environment by Regina Bennett

- Count VII: § 1983 - 14th Amendment - Due Process by all Plaintiffs[3]

- Count VIII: § 1983 - 14th Amendment - Equal Protection by all Plaintiffs[4]

## V.   STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Fla. Int'l Univ. Bd. Of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).

---

[3] Count VII broadly alleges violations of the "substantive and procedural due process rights and equal protection under the law" of Plaintiffs Margaret West, Regina Bennett, Shawnda Bell and Joseph West. (Doc. 1 at 26.) Since the claim generally refers to all Plaintiffs, the Court will construe the claim as brought by all six Plaintiffs. And while the claim is also titled as a race discrimination claim pursuant to Title VII, § 1981, and § 1983, the Court will treat it as a due process claim since the substance of the claim relates only to due process.

[4] Count VIII broadly alleges equal protection violations applicable to all six Plaintiffs even though in other places it references only Margaret West, Regina Bennett, Shawnda Bell, and Joseph West. Like Count VII, the Court construes it as applicable to all Plaintiffs.

However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Moreover, the movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id*. The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id*. at 1311–12.

A genuine dispute of material fact exists when the plaintiff produces evidence that would allow a reasonable fact-finder to return a verdict in his favor such that summary judgment is not warranted. *See Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort*

*Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (citation omitted). However, disputes involving material facts are relevant, and materiality is determined by the substantive law applicable to the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## VI.   DISCUSSION

### A. Title VII Claims Against the Individual Defendants

The Court begins with Plaintiffs' Title VII claims against the individual defendants.  To the extent such claims are asserted, they are dismissed. As has long been held in the Eleventh Circuit, individual school officials and board members cannot be sued in their individual capacities under Title VII. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1234 n.3 (11th Cir. 2016); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) (per curiam) (holding that the proper method for an employee to recover under Title VII is by suing the employer, either by naming supervisory employees as agents of the employer or by naming the employer directly; individual capacity suits under Title VII are inappropriate). And further, individual school officials and board members need not be named when the school board is also named as a defendant. *See, e.g*., *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1308 (M.D. Ala. 2012) ("They are also correct that, because Lewis has named the school board as a defendant on her Title VII retaliation claim, naming them too as defendants in their 'official capacities' is redundant.").

Accordingly, summary judgment is granted to the extent Plaintiffs are suing the individual school board members in their individual and official capacities and the superintendent in his official capacity for violations of Title VII in Counts I through VI.

### B. Title VII Discrimination Claims Against the Board

Counts I, II, III and IV include Title VII race discrimination claims by Mr. and Mrs. West, Bennett, and Bell against the Board associated with their respective job reassignments and transfers. The Board argues that it is entitled to summary judgment on each claim.

As a preliminary matter, contrary to these four Plaintiffs' assertions otherwise, they both as a group and individually have failed to present direct evidence of race discrimination. Direct evidence of discrimination is "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)). It is "evidence, which if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Burrell v. Bd. of Trs. of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (citations omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [basis of a protected classification]' are direct evidence

of discrimination." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (citing *Damon*, 196 F.3d at 1359). If the alleged statement suggests but does not prove a discriminatory motive, it is circumstantial evidence. *See Burrell*, 125 F.3d at 1393.

As for direct evidence, Plaintiffs generally cite to various emails that discuss moving administrators out of the Central Office as well as the discriminatory history of the school district. That is not the kind of evidence that constitutes direct evidence of discrimination as to the personnel decisions involving the Plaintiffs, who were six of more than twenty diverse people impacted by reshuffling. Indeed, evidence of employment decisions regarding employees other than each Plaintiff is quintessential circumstantial evidence, as it establishes discriminatory intent, if at all, only by inference. Evidence of remarks unrelated to the decision-making process is also, by definition, circumstantial. *See E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir. 1990). In short, the Plaintiffs' submissions are woefully inadequate to make a direct evidence case of discrimination. As such, the Court proceeds to consider whether each of the Plaintiffs has made a prima facie case based on circumstantial evidence.

Courts test the sufficiency of Title VII claims based on circumstantial evidence by applying the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *See Chapman v. AI Transp.,* 229

F.3d 1012, 1024 (11th Cir. 2000) (*en banc* ).[5]   Under this framework, a plaintiff bears the initial burden of establishing a *prima facie* case, and by doing so, creates a rebuttable presumption of discrimination. *See Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1193 (11th Cir. 2004). The burden then shifts to the defendant "to articulate a legitimate, non-discriminatory reason for the challenged conduct." *Id.* Notably, the defendant's burden at this stage is merely one of production, and it need not "persuade the court it was motivated by the [proffered] reason." *Id.* By meeting this burden, the defendant eliminates the presumption of discrimination and leaves the plaintiff with the ultimate burden of proving that the defendant acted with intentional discrimination. *Id.*  Specifically, the plaintiff must proffer sufficient evidence to create a genuine dispute of material fact as to whether the defendant's proffered reasons are pretextual. Failure to do so entitles the defendant to summary judgment on the claim.

To establish a prima facie case for discrimination under *McDonnell Douglas*, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) either she was replaced by a person outside her protected class or a similarly situated employee outside her class was treated

---

[5]  Plaintiffs attempt to argue for a convincing mosaic by referring to the same evidence as for *McDonnell Douglas*. The convincing mosaic analysis is therefore subsumed by the *McDonnell Douglas* analysis. *See Berry v. Crestwood Healthcare, L.P.*, No. 5:19-CV-01407-LCB, 2021 WL 5866719, at *7 (N.D. Ala. Dec. 10, 2021). In any event, no convincing mosaic of race discrimination has been shown here as to any plaintiff.

more favorably; and (4) she was qualified to perform her job. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam).

Of these, the Board focuses its summary judgment argument on the second and third elements of the Plaintiffs' prima facie cases—adverse employment actions and comparators. The Court will address these two in turn.

### 1)  Adverse Employment Action

A qualifying adverse employment action in the Title VII context "must in some substantial way alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). There must be a serious and material change in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Redd v. United Parcel Serv., Inc.*, 615 F. App'x 598, 603 (11th Cir. 2015) (per curiam).

Five general principles guide the Court's analysis in determining whether the transfers or reassignments here are actionable adverse employment actions.

First, purely lateral transfers—transfers that do not involve a demotion in form or substance—do not rise to the level of an actionable adverse employment action. *See Martin v. Eli Lilly & Co.*, 702 F. App'x 952, 958 (11th Cir. 2017) (discussing

that purely lateral transfers are not adverse); *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014) (per curiam) (same); *Hinson v. Clinch Cnty. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000) ("In a Title VII case, a transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige or responsibility."); *Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (applying standard in the Americans with Disabilities Act context).

Second, transfers that impede an employee's professional growth or advancement may constitute an adverse employment action. *See Hart v. United States Att'y Gen.*, 433 F. App'x 779, 781–82 (11th Cir. 2011) ("Additionally, transfers that are a form of demotion or that disrupt investment in education, training, or seniority may qualify as an adverse employment action."); *Doe*, 145 F.3d at 1453 n.22 (listing missed "employment opportunities" as one factor in determining whether an action was adverse).

Third, increased stress resulting from a transfer is insufficient to make the transfer adverse. *See Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 714 (11th Cir. 2013) (per curiam) ("The anti-discrimination statutes do 'not guarantee a stress-free working environment'") (quoting *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233–34 (11th Cir. 2001)).

Fourth, a longer commute resulting from a new position is a mere inconvenience, not rising to adversity. *See Varnedoe v. Brennan*, No. CV418-067,

2021 WL 1115300, at *4 (S.D. Ga. Mar. 2, 2021) ("The fact that the transferee position is inconvenient, for example because it requires a longer commute, is insufficient to make it adverse for Title VII purposes."), *report and recommendation adopted*, No. CV418-067, 2021 WL 1112700 (S.D. Ga. Mar. 23, 2021), *aff'd sub nom. Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614 (11th Cir. Jan. 4, 2022); *Stewart v. Argos Ready Mix, LLC*, No. 3:16-CV-356-MHT-WC, 2016 WL 7238915, at *7 (M.D. Ala. Nov. 1, 2016), *report and recommendation adopted*, No. 3:16CV356-MHT, 2016 WL 7234092 (M.D. Ala. Dec. 14, 2016) (holding that reassignment which increased employee's commute time from five to seven minutes to between thirty and forty minutes was not an adverse employment action); *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1136 (N.D. Ga. 2004) ("[A]n overwhelming number of federal courts have held that a reassignment or transfer which results in an increased commute, without more, is not objectively serious and tangible enough to meet the threshold of substantiality.").

Fifth, and perhaps most crucial, a plaintiff's subjective belief or personal preference bears little, if any, weight because the reasonable person standard guides the inquiry. *See Duble*, 572 F. App'x at 895 ("The plaintiff's subjective preference of one position over another is generally not relevant to determine whether an action was adverse."); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) ("Moreover, the employee's subjective view of the significance and adversity of the

employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."); *Lawson v. Plantation Gen. Hosp., LP*., 704 F. Supp. 2d 1254, 1269 (S.D. Fla. Mar. 30, 2010); *Richardson v. Jackson*, 545 F. Supp. 2d 1318, 1328 (N.D. Ga. 2008) ("Mere idiosyncrasies of personal preference are not sufficient to state an injury").

### a.  Joseph West

In Count I, Joseph West alleges that the Board "took adverse employment action and transferred J. West because of his race."  (Doc. 1 at 20.) He claims that his new position as an assistant principal was less prestigious than his former position in the Central Office because his new position included fewer supervisory and more menial responsibilities. He also asserts that the new job required him to work under someone with whom he had a personal conflict.  The Board argues that the position change is not actionable because there was no compensation change and Mr. West's subjective preferences are irrelevant.

Mr. West has provided little objective evidence about significantly altered responsibilities to support his allegation that he lost complex and supervisory responsibilities when he was transferred. *See Kidd v. Mando Am. Corp*., 731 F.3d 1196, 1203 (11th Cir. 2013) (finding that the loss of supervisory responsibilities is not a material change absent a showing of significantly different responsibilities); *Dominguez v. Lake Como Club,* 520 F. App'x 937, 941 (11th Cir. 2013) (per curiam)

(holding that more difficult assignments are not adverse); *White v. Hall,* 389 F. App'x 956, 960 (11th Cir. 2010) (same); *Belt v. Ala. Hist. Comm'n,* 181 F. App'x 763, 764–65 (11th Cir. 2006) (per curiam) (holding that minor changes in job duties, including suspending authority to order inventory and requiring reports to go through a supervisor, were not adverse employment actions). Instead, Mr. West merely argues that *some* of his new duties included assisting in the lunchroom, lifting textbooks, and performing bus duty and administrative tasks while remaining in an administrative position with authority over certain operations at W.O Parmer. Mr. West must do more than allege *some* changes in job duties. He must demonstrate that a reasonable person in his position would view his transfer as adverse. He has not.

Finally, that Mr. West had a personal conflict with his new supervisor does not make his transfer actionable under Title VII. *See, e.g., McCann v. Mobile Cnty. Pers. Bd.*, No. 05-cv-364, 2006 WL 1867486, *18 (S.D. Ala. July 6, 2006), *aff'd sub nom. McCann v. Tillman*, 526 F.3d 1370 (11th Cir. 2008) (finding desire for a different supervisor insufficient to show adverse employment action).

Simply put, the Court concludes that Mr. West's transfer constitutes a *de minimis* and unactionable transfer to a position that he subjectively believes is less becoming. He therefore runs afoul of the Eleventh Circuit's admonition that "[i]t is important not to make a federal case out of a transfer that is de minimis, causing no

objective harm and reflecting a mere chip-on-the-shoulder complaint." *Hawkins v. BBVA Compass Bancshares, Inc.*, 613 F. App'x 831, 836 (11th Cir. 2015) (per curiam). Accordingly, summary judgment is due to be granted as to Count I.

### b.  Margaret West

In Count II, Margaret West alleges that the Board "took adverse employment action and transferred M. West." (Doc. 1 at 21.)  She claims that the proposed transfer from the guidance counselor position at Greenville Middle School to the career tech counselor position, which she ultimately refused to accept,[6] constituted a transfer to a position that was "more stressful," included "more complex and broad duties," and increased her daily drive to work by approximately three miles. The Board challenges Ms. West's assertion that this transfer constituted an actionable adverse employment action primarily because there was no change in compensation and since Ms. West's subjective beliefs are irrelevant. The Court agrees with the Board.

---

[6] After the Board voted to approve her transfer, but before her transfer date, Ms. West "felt compelled to retire." (Doc. 1 at 12.)  She does not bring a claim for constructive discharge. Instead, she only brings  a claim for discriminatory transfer. However, because she retired before starting the new position, it is arguable that she has not suffered an injury-in-fact and therefore lacks standing. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 114 (2002) (explaining that employment events constitute completed acts when they occur). But the Court chooses not to entangle itself in this debate since the Board does not raise it and since the Board is entitled to summary judgment regardless.

First and foremost, the mere fact that Ms. West was to be transferred over her objection, without more, does not give rise to an actionable adverse employment action. In other words, Ms. West's subjective feelings about the move are irrelevant. *See Doe*, 145 F.3d at 1450.

Second, Ms. West's assertion that the new position would be more stressful does not make the transfer actionable either. *See Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 714 (11th Cir. 2013) ("The anti-discrimination statutes do 'not guarantee a stress-free working environment.'") (quoting *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1233–34 (11th Cir. 2001)).

Third, and equally unavailing, is her assertion that the transfer is actionable because the new position would require her to learn new skills—like recruiting—or assume new responsibilities—which may entail more travel. *See Doe*, 145 F.3d at 1453 ("All transfers require some learning since they require employees to work with new people or products and to assume new responsibilities"); *Hart v. U.S. Atty. Gen.*, 433 F. App'x 779, 782 (11th Cir. 2011) (per curiam) ("It is not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities, however, because all transfers generally require an employee to engage in some learning, work with new people, and accept new responsibilities.").

Finally, the Court finds unpersuasive Ms. West's assertion that because she would have to drive an additional three miles every day to attend the new position. *See, e.g.*, *Varnedoe*, 2021 WL 1115300, at *4.

In sum, the Court concludes Ms. West's proposed transfer did not constitute an actionable adverse employment action under Title VII based on the record presented. Accordingly, summary judgment is due to be granted as to Count II.

### c.   Regina Bennett

Bennett was reassigned within W.O. Parmer from guidance counselor to kindergarten teacher. In Count IV, she claims that her future job advancement prospects were harmed, that she was set up to fail, and that she was transferred to a less prestigious position that had less student impact.  She acknowledges that she did not suffer any loss of compensation.

The Board argues that Bennett offers insufficient evidence that her internal reassignment within the same school constituted an actionable adverse employment action. It notes that Bennett did not suffer a loss of pay or benefits and that she has offered no objective evidence that being reassigned to a new position within the same school resulted in the deprivation of future job advancement opportunities or loss of prestige.

Like the others, the Court concludes that Bennett has failed to provide sufficient evidence showing that her reassignment within the same school

22

constituted an actionable adverse action. Her subjective and conclusory assertions, like that she was "set up to fail" or that the position was less prestigious, are insufficient.

In fact, when it comes to Bennett's subjective beliefs about the two positions, in her deposition, Bennett was less than definite about a difference between the two positions, as she testified that a teacher position is no less prestigious than a guidance counselor position. As she characterizes it, her primary concern was that the new position would require her to train for the position. That assertion, even if true, does not make the reassignment actionable. *See Doe*, 145 F.3d at 1453 ("[A]ll transfers require some learning since they require employees to work with new people or products and to assume new responsibilities").

Bennett also argues that the transfer would impact her career track because she had become nationally certified in counseling so that she would not have to return to the classroom. But here, Bennett was reassigned to a position that she already was qualified to perform. Although her certification in counseling would not necessarily be relevant to her kindergarten teacher job, she was still within the same school and she had taught a similar age group in elementary school before. Without more, she fails to show with specific evidence that her existing skills were rendered useless by her reassignment. In other words, Bennett's transfer, although a personal

setback, did not arise to "severe professional trauma."  *See Doe*, 145 F.3d at 1453
(holding that transfer did not rise to severe professional trauma).

Finally, Bennett's subjective and unsupported assertion that she would impact
fewer students in her new role is not actionable either, as this assertion focuses on
the impact on others and not Bennett.

Because Bennett's reassignment, under the record presented to this Court, did
not constitute an actionable adverse action, summary judgment is due to be granted
as to Count IV.

### d.  Shawnda Bell

Like the others, Bell, who suffered no loss of compensation or benefits, also
cites the loss of prestige in the context of her transfer from a career tech counselor
position for the school district as a whole to a guidance counselor position at
Greenville Middle School. The Board disputes there was a loss of prestige and
additionally points to the testimony of Catherine Tanner, Lisa Adair, and Plaintiff
Margaret West, who all testified that there was no counseling position within the
district that was more prestigious than any other.  The Court concludes that the Board
has not shown its entitlement to summary judgment on this element of Bell's prima
facie case because Bell, unlike the others, has presented sufficient evidence of a loss

of prestige.[7]

Again, loss of prestige generally is insufficient in itself to support an actionable adverse employment action. As the Eleventh Circuit stated in *Davis v. Town of Lake Park,* "[i]n the vast majority of instances, . . . we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause...." 245 F.3d at 1245. But when the loss of prestige due to a transfer results in fewer skills used at work and less specialized experience necessary to work, the transfer in certain circumstances can be actionable. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (finding prestige evidenced by greater skill and more specialized experience); *Holland v. Gee*, 677 F.3d 1047, 1058 (11th Cir. 2012) (finding that transfer to less technical and more administrative role was adverse).

Bell has presented more than self-serving, conclusory opinion testimony about the loss of prestige associated with her transfer, unlike the other counselor plaintiffs. Bell has presented testimony from Jennifer Burt, the former director of

---

[7] Because the Court concludes that Bell has provided sufficient objective evidence that the position to which she was transferred was less prestigious, the Court need not address the remaining reasons Bell presents for why she suffered an adverse action, such as lack of confidentiality in handling her transfer, her general opposition to the move, that she has to perform non-counseling duties in her new role, or the duration of her responsibilities on an annual basis.

career technical education, and Linda Hamilton, a school board member, to support her assertion that her new position as a guidance counselor required fewer skills and less specialized experience. Burt testified that there is a "certain specialty of skill that is required to fill the role as District [] Career Tech Counselor" because an in-depth understanding of workforce development, industry, and partners in the community is necessary. (Doc. 209-2 at 3–4.) She further testified that interaction with parents and hosting training and tooling sessions for the various schools in the district are required. (*Id.*) She went on to state that there "are quite a few differences" in terms of what the career tech counselor requires, including a "great deal of travel" and "necessary training and conferences," and that the counselor "must also host financial aid workshops, District wide parental nights, job fairs, internship opportunities, job placement, and dual enrollment opportunities resulting in students being College and Career Ready." (Doc. 209-2 at 6–7.) Based on these varying duties, Burt says, "Mrs. Bell had to attend innumerable trainings, professional development sessions, and workforce development sessions to master the skills for this counseling position." (Doc. 209-2 at 9.)

Board member Linda Hamilton echoed these observations in her testimony, stating that career tech was one of the district's flagship programs. (Doc. 164-18 at 213.) According to Hamilton, when the administrator is out, the counselor must run the program, including machine maintenance, welding, and nursing, which are "very

technical areas." (Doc. 164-18 at 214.) Hamilton also stated that kids are bused in from different schools for the program, and the administrator is on the road a lot, so the counselor "has to step in and be the principal to run that program." (Doc. 164-18 at 214.)

Based on this evidence, the Court concludes that Bell has made a sufficient showing, although barely, that her transfer from the career tech counselor position to a guidance counselor position constitutes an actionable adverse employment action. Accordingly, the Board is not entitled to summary judgment on this element of Bell's prima facie case.

### 2) Comparators

Since only Bell has sufficiently satisfied the adverse employment action element of her prima facie claim, the Court next considers the Board's argument that Bell cannot show that she was replaced by someone outside her protected class or show a proper comparator.

Bell argues that she was replaced by Briana Hunter, a white female who was hired from outside the district. The Board disputes this, stating that Bell actually was replaced by Margaret West, who was black. The record however reveals a likely middle-ground; that is, while Ms. West was offered Bell's job, Ms. West retired rather than replacing Bell, who was then replaced by Hunter, who is white. Based on the evidence, the Court concludes that Bell has sufficiently shown that there is a

question of fact on the issue, at a minimum. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam).

But even if Bell was unable to show that she was replaced by someone outside her protected class, she nevertheless has sufficiently shown an appropriate comparator, the other means of meeting her burden on her fourth and final element of her prima facie case. To establish whether the Board treated similarly situated employees outside their protected class more favorably, Bell must show that she and her proffered comparators were similarly situated in all material respects. *Lewis*, 918 F.3d at 1224 (explaining the parameters of this standard in a termination case); *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 131 (11th Cir. 2019) (per curiam) (same). This does not require that the proffered comparators have the exact job title or that the plaintiff "and her comparators be identical save for their race or gender." *Lewis*, 918 F.3d at 1227. Instead, they will generally (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy or guidelines; (3) have been working under the same supervisor; and (4) share the plaintiff's employment or disciplinary history. *Id*. at 1227–28. A valid comparison turns "not on formal labels, but rather on substantive likenesses." *Id*. at 1228. "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—e.g., who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id*.

Bell argues that Haden Horton is a proper comparator because Horton was a white counselor who reported to the same counseling supervisor, and she was not transferred despite having performance issues, which Bell did not. Bell also argues that Tonya Coker and Todd Henderson also were white counselors who were not transferred despite having the same counseling supervisor.

This Court's review of the record reveals that all four counselors are similar in that they are employed by the Board and report to the same districtwide counseling supervisor—Catherine Tanner at the time of the transfers, then later, Lisa Adair. (Doc. 179 at 46, 61.) The Board does not dispute these two similarities. Instead, the Board primarily argues that because Bell had a different immediate supervisor (each counselor had both a districtwide counseling supervisor and an immediate supervisor—the principal) from the other counselors, there was a basis other than race that explained Bell's differential treatment. *See Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) (collecting cases explaining that different managers can suggest a basis other than race or sex as reason for differential treatment). The Board argues Bell was suggested for transfer by her principal because he believed her skillset was needed in the new role.

But the requirement that a plaintiff and the proposed comparator share the same immediate supervisor is not absolute. *See Lewis*, 918 F.3d at 1228. More importantly, the Board's stated rationale is problematic because there is a question

of fact about whether the school principals actually recommended the counselors' transfers or whether the transfer directives came from the Central Office. According to Jennifer Burt, the Central Office contacted her in an effort to obtain Burt's agreement regarding Bell's transfer, but Burt opposed it. Validating this point, Bell has presented evidence showing that the Central Office emailed Burt and directed Burt to copy and paste into a letter Bell's transfer recommendation. (*See* Doc. 167-12 at 347.) In a similar vein, Eiland from the Central Office testified that the school principals were instructed to sign the transfer letters because the Central Office wanted to have principal recommendations on record. (*See* Doc. 167-12 at 162.)

All told, Bell has presented sufficient evidence to create a question of fact on this issue and therefore Bell has sufficiently met her burden on the fourth element of her prima facie case.

### 3) The Board's Legitimate, Nondiscriminatory Reasons for Bell's Transfer

Because Bell has sufficiently established her prima facie case under *McDonnell Douglas*, the burden shifts to the Board to articulate a non-discriminatory basis for Bell's transfer. The Board's burden at this stage is "exceedingly light." *Tipton v. Can. Imperial Bank of Com.*, 872 F.2d 1491, 1495 (11th Cir. 1989). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 257 (1981)).

As for the decision to transfer Bell, the Board *currently* states as follows in its summary judgment motion:

> Ms. Bell was recommended to replace Ms. West as Counselor at GMS because she had experience in both College & Career Readiness ("CCR") and career pathways. Ms. Bell's experience made her the best choice to serve as GMS counselor, to interact with and guide the district's middle school students at this important juncture of their education.

(Doc. 156 at 5.)

The Court concludes this is a legitimate, non-discriminatory reason to transfer Bell. As such, the burden shifts back to Bell to show that this stated reason was a pretext for discrimination. To show pretext, Bell could identify weaknesses, inconsistencies, or contradictions in the Board's articulated reasons for its actions so that a reasonable factfinder would find them unworthy of credence. *See Alvarez v. Royal Atlantic Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). In other words, Bell cannot attempt to recast the articulated non-discriminatory reasons or substitute her business judgment for that of the Board. A reason cannot be pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

As evidence of pretext, Bell points to the Board's shifting, inconsistent, and nebulous reasons for her transfer. The Eleventh Circuit has been clear that evidence of an employer's "shifting explanations for its actions" can constitute sufficient evidence of pretext. *See Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1194 (11th Cir. 2004) ("These inconsistent reasons allowed the jury to question his credibility. Once [the decisionmaker's] credibility was damaged, a rational jury could infer that he did not fire [the plaintiff] because of the infomercial, but rather because of her disability."); *Bechtel Constr. Co. v. Sec'y of Lab.*, 50 F.3d 926, 935 (11th Cir. 1995) ("The pretextual nature of [the decisionmaker's] terminating [the plaintiff] is further demonstrated by [the decisionmaker's] shifting explanations for its actions."). The Eleventh Circuit has also recognized that vague and nebulous reasons can constitute evidence of pretext. *See Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990) (rejecting the statement that a candidate was best qualified as too vague because it "leaves no opportunity for the employee to rebut the given reason as a pretext"); *see also Bouldin v. Troy City Bd. of Educ.*, No. 2:13-CV-898-JA-GMB, 2016 WL 11674943, at *7 n.17 (M.D. Ala. July 19, 2016) ("[V]ague descriptions of why [the replacement] was regarded as the most qualified, along with the other evidence of retaliatory animus, present a jury question on the issue of pretext.").

Indeed, a "subjective reason is a legally sufficient, legitimate, nondiscriminatory reason only if the employer articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Chapman v. AI Transp.,* 229 F.3d 1012, 1034 (11th Cir. 2000) (en banc). *See also Burdine*, 450 U.S. at 255–56 ("A defendant must present its legitimate, nondiscriminatory reason with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.").

Bell first points to the vague, nebulous, and nonspecific nature of the language *first* used by the Board in the transfer notice given to her—the need to maximize personnel resources. Several board members who voted on the transfers were unfamiliar with the phrase "maximize personnel resources" and could not explain what it meant when questioned in their depositions about it. (Doc. 164-7 at 224–25; Doc. 164-8 at 57; Doc. 165-15 at 79–80; Doc. 179 at 12.)

Bell also points to the Board's later shifting explanation of the phrase's meaning which now, in this litigation, apparently means transferring her because she was an indispensable asset. (Doc. 179 at 169.) She notes that the initial explanation provided by the Board for all of the transfers was Strycker's testimony that he was the one who initiated all of the transfers of the counselors because recordkeeping was off and "things were just way out of line," a negative inference concerning the performance of the counselors, including Bell. (Doc. 165-8 at 171.) Then, the next

explanation, which was found in the notices of transfer, was "maximizing personnel resources." And then, the latest reason given for transferring Bell was because of her skillset and because of the recommendation of Principal Marlow. (Doc. 156 at 5.)

There is more, according to Bell. Assuming that the Board's proffered reasons are legitimate, Bell points out that the varying reasons are implausible, inconsistent, and easily disproved based on the record. For example, the record-keeping that Strycker initially referenced had nothing to do with the district's counselors, such as Bell, who all had received glowing reports from the state board of education.  (Doc. 185-38 at 2.) Further, Bell notes that Bell's skillset was not actually needed at Greenville Middle School because her skills and certifications were inapplicable to younger students.  (Doc. 185-2 at 7–26.) And finally, Bell notes the inconsistencies in the Board's citation to principal autonomy because of evidence, including testimony from Bell and Eiland, showing that the Central Office actually required the principals to initiate the transfers of Bell and Moore while not doing the same with a white counselor, Haden Horton.

These shifting, somewhat inconsistent and vague reasons are sufficient for Bell to meet her burden to show the Board's reasons are pretextual. *See Home Shopping Network, Inc*., 369 F.3d at 1194; *Bechtel Constr. Co.*, 50 F.3d 926.  All told, Bell has adequately shown material issues of fact as to whether the proffered

reasons for her transfer were the true reasons for the employment decision as to Bell. Accordingly, summary judgment as to Count III is due to be denied.

### C.    Bennett's Hostile Work Environment Claim

In addition to her race discrimination claims, Bennett also brings a claim in Count VI for a racially hostile work environment. The Board seeks summary judgment on this count, asserting that Bennett cannot show that there was harassment, let alone severe or pervasive harassment based on race enough to alter the terms and conditions of her employment. The Court agrees.

To establish a hostile work environment claim, Bennett must show (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. *See Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002); *Mendoza v. Borden*, 195 F.3d 1238, 1245 (11th Cir. 1999). A totality of the circumstances approach is necessary when evaluating hostile environment claims. *See Fortson v. Carlson*, 618 F. App'x 601, 606 (11th Cir. 2015) (per curiam); *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250 (11th Cir. 2014).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21 (1993). The Court considers the following factors in evaluating whether conduct is severe or pervasive enough to create an objectively hostile or abusive work environment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. "Conduct is objectively severe when the workplace is permeated with intimidation, ridicule, and insult." *See Smithers v. Wynne*, 319 F. App'x 755, 758 (11th Cir. 2008) (per curiam). "Simple teasing, offhanded comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment." *Id*. (citing *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998)). Courts must employ common sense and "an appropriate sensitivity to social context" when determining whether a plaintiff has alleged facts that a jury could reasonably find created an objectively hostile or abusive work environment. *Oncale*, 523 U.S. at 82.

As evidence of a severe or pervasive hostile work environment based on race, Bennett argues that she was not allowed to attend a professional development

activity, that she was yelled at on one occasion, that she was denied trash bags and bookshelf space, that there was a leak in her classroom, and that she had to substitute teach on occasion although it was not part of her job description. When considered in its totality or individually, this conduct does not rise to a sufficient level to support a claim of a severe or pervasive hostile work environment, let alone a hostile work environment based on race.

Indeed, courts have found that similar and even more extreme behavior than that reported by Bennett was insufficient to support a claim under Title VII. *See Bussell v. Motorola, Inc.,* 141 F. App'x 819, 823 (11th Cir. 2005) (per curiam), *vacated by* 549 U.S. 801 (2006), *reinstated by* 228 F. App'x 832 (11th Cir. 2006) (noting that occasional yelling by a supervisor is not actionable harassment); *Herawi v. Ala. Dep't of Forensic Scis.,* 311 F. Supp. 2d 1335, 1351 (M.D. Ala. 2004) (finding that yelling and other negative comments could not establish a hostile work environment because such conduct was not sufficiently pervasive or severe). Moreover, the Eleventh Circuit has examined and rejected hostile environment claims with far worse allegations involving overtly racist speech, comments, or symbols. *See McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (finding white supervisor using racist language sporadically about employee did not create hostile work environment); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (per curiam) (finding presence of racist symbols and use of racial slur by

supervisor did not constitute hostile work environment). *See also Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (finding supervisor's remarks that plaintiff was a "dumb s--t," "stupid f--k," and "dumb f--k," fell "under the rubric of general vulgarity that Title VII does not regulate"); *compare Miller*, 277 F.3d at 1276 (finding supervisor's ethnic slurs about employee were so frequent so as to permeate the workplace, thus demonstrating hostile work environment). And none of that exists here.

At bottom, Bennett's evidence is neither severe nor pervasive enough to support an actionable claim under Title VII, nor is it racially hostile. Bennett's claim is based on nothing more than workplace trivialities that find no protection under the law. Therefore, summary judgment as to Count VI of the Complaint is due to be granted.

### D. Bennett's Title VII Retaliation Claim

In Count V, Bennett brings a Title VII retaliation claim. According to Bennett, she was reassigned after complaining in late January 2018 to Strycker and Jacqueline Thornton about Thornton's racially discriminatory treatment of her. In particular, Bennett complained that Thornton had talked to her in a demeaning manner, made her perform duties of substitute teaching outside her job description, and yelled at her in front of others. The Board moves for summary judgment, arguing that there

is no causal connection between Bennett's complaint in January 2018 and her reassignment four months later. The Court agrees with the Board.

To be sure, Title VII forbids retaliation against an employee who engages in protected activity, such as reporting race discrimination in the workplace. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 273 (2009). In the absence of direct evidence of discrimination, which is the case here, the *McDonnell Douglas* framework is applied when analyzing retaliation claims. *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

To establish a prima facie claim of retaliation, Bennett must show that: (1) she engaged in an activity protected under Title VII, (2) she suffered an adverse employment action, and (3) that the adverse action was causally related to the protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244–45 (11th Cir. 2020). Once Bennett establishes her prima facie case, the burden shifts to the Board to articulate a legitimate reason for the adverse action. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). If the Board does so, to avoid summary judgment, Bennett must produce sufficient evidence for a reasonable factfinder to conclude that each of the Board's proffered reasons is pretextual. *Chapman v. AI Transp.,* 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc).

The Board does not dispute that Bennett's complaint of a hostile work environment based on race constitutes protected activity sufficient to establish the first element of her retaliation claim. Nor does it challenge that her reassignment was an adverse employment action in the context of retaliation. Instead, the Board primarily challenges the causation element, to which the Court will confine its analysis.

To establish causation, Bennett must show that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360). Generally, when the person who took the adverse action is aware of the predicate protected conduct, "close temporal proximity between the employee's protected conduct and the adverse employment action" is sufficient to overcome summary judgment by establishing causation. *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). But in such an instance, the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (holding three months to be too distant a period between protected activity and adverse action to warrant an inference of causation solely based on temporal proximity).

Where there is a significant time gap between the protected activity and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism by the employer after the complaint and before the adverse action. *See, e.g., Ward v. UPS*, 580 F. App'x 735, 739 (11th Cir. 2014) (per curiam).

Here, Bennett was notified of her reassignment at the end of April 2018, four months after her complaint to Strycker. This three- to four-month gap is too remote to establish a causal connection based on temporal proximity alone. *See Johnson v. Miami-Dade Cnty.,* 948 F.3d 1318, 1328 (11th Cir. 2020) (holding three to four month gap as insufficient to establish pretext by itself).

Bennett also cites actions taken allegedly against her after she complained. She claims, for example, that immediately after her complaint to Strycker, Strycker asked Jacqueline Thornton about Bennett's evaluations in front of Bennett and told Bennett that if she did not like how things were, she could find another job. She further claims that Thornton told Bennett that "we're going to hire—for your position next year." (Doc. 162-10 at 64.) These statements are far too ambiguous and isolated to show a pattern of antagonism based on race.

The Court therefore concludes that Bennett has failed to present sufficient evidence of a causal connection to establish a prima facie case of retaliation. Therefore, summary judgment as to Count V of the Complaint is due to be granted.

### E.  Plaintiffs' Due Process Claims

In Count VII, the Plaintiffs bring a 14th Amendment due process claim under § 1983. They allege that the Defendants violated Plaintiffs' substantive and procedural due process rights because the Plaintiffs had a constitutional due process right to a hearing under the Students First Act, Ala. Code § 16-24C-1, *et seq*.  The individual Defendants assert their entitlement to qualified immunity on the due process claims because, as they say, they were making discretionary decisions within the scope of their employment when voting on employment transfers and because Plaintiffs cannot show a due process violation.

First, Defendants correctly argue that Plaintiffs' factual allegations do not implicate substantive due process issues; instead, they implicate procedural due process issues.  *See McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc). Accordingly, the Court will proceed to examine Count VII as a procedural due process violation claim.

And as to the procedural due process claim, Defendants argue that Plaintiffs had available to them due process under the Students First Act and were afforded hearings for those who timely and properly requested them.  As such, Plaintiffs cannot show a procedural due process constitutional violation for purposes of meeting their burden under the Defendants' assertion of qualified immunity.

Government officials are provided complete protection by qualified immunity when sued in their individual capacities, as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vineyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity allows government officials to carry out the discretionary duties of their position "without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

The Court must engage in a two-part analysis to determine whether a government official is entitled to qualified immunity. "First the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden the plaintiff must prove that the official's conduct violated clearly established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted).

When determining if an official's actions were within the scope of his discretionary authority, the Court must consider "whether they are of a type that fell within the employee's job responsibilities." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). An official will be found to have been acting

within the scope of his discretionary authority if he was "(a) performing a legitimate job-related function (that is, pursuing a job related goal), (b) through means that were within his power to utilize." *Id.*

Here, it is clear the board members were acting within the scope of their discretionary authority because it is only by virtue of their positions as school board members that they were tasked with considering and voting on the employment transfers at issue. *See* Ala. Code § 16-24C-7 (listing circumstances when employees may be transferred with board approval); *Weissenbach v. Tuscaloosa Cnty. Sch. Sys.*, No. 7:17-CV-001642-LSC, 2018 WL 5848047, at *11 (N.D. Ala. Nov. 8, 2018) ("Here, it is clear that the Board Members, Burroughs, and Fitzpatrick were acting within the scope of their discretionary authority because it is only by virtue of their positions as school board members and administrators that they were tasked with investigating Petrey's relationship with Weissenbach."). So, plaintiffs must prove that the board members' conduct constituted a due process violation.[8]

To establish a procedural due process violation under 42 U.S.C. § 1983, a plaintiff must show: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). A property interest exists

---

[8] The superintendent is sued only in his official capacity, so the discussion on qualified immunity does not pertain to him.

if an employee "has a legitimate claim of entitlement to continued employment." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). Such a claim can exist through a "mutually explicit understanding" with the employer that "support[s] a claim of entitlement." *Id*. Courts should look to state law in determining whether an employee had a property interest. *Bishop v. Wood*, 426 U.S. 341, 344 (1976); *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991).

The Students First Act is the statute that provides due process. Under the Students First Act, if the proposed transfer is to a work site outside of the high school feeder pattern in which the teacher is currently working, then the teacher may request a hearing before the board prior to a vote of the board on the proposed transfer. Ala. Code § 16-24C-7. The Students First Act further dictates that a deliberation on the merits will not be made prior to such a hearing whenever the act affords an employee a right to be heard by the governing board. *See* Ala. Code § 16-24C-8. An employee may then appeal to the Chief Administrative Law Judge of the Office of Administrative Hearings in the Office of the Attorney General, who will appoint an Administrative Law Judge to address the appeal. *See* Ala. Code § 16-24C-12. The judge shall review the request of the employee and determine with or without a hearing whether the employer has complied with the proper procedures under the Students First Act. *Id.* An application for judicial review from the decision of the

Administrative Law Judge shall be filed in the circuit court of the county in which the principal administrative offices of the employer are located. *Id.*

Defendants point out that only Plaintiffs Thornton and Moore timely appealed to the Board and then to a hearing officer but that they failed to file an application for circuit court review, which they could have done under the Students First Act. Defendants also point out that Joseph West, Margaret West, and Bell did not appeal to an ALJ when they could have. All told, none of these Plaintiffs can advance a claim for a violation of their due process rights through § 1983 when they failed to avail themselves, or exhaust, of the rights that they did have. *See, e.g., Foxy Lady, Inc. v. City of Atlanta*, 347 F.3d 1232, 1238 (11th Cir. 2003) ("[E]ven if a procedural deprivation exists during an administrative hearing, such a claim will not be cognizable under § 1983 if the state provides a means by which to remedy the alleged deprivation."); *Laskar v. Peterson*, 771 F.3d 1291, 1300 (11th Cir. 2014) ("[E]ven if a plaintiff suffered a procedural deprivation at his administrative hearing, there is no procedural due process violation if the state makes available a means to remedy the deprivation.").

And finally, Plaintiffs have failed to allege that the State of Alabama has "refuse[d] to provide a process sufficient to remedy the procedural deprivation." *McKinney,* 20 F.3d at 1557; *Turner v. Alabama*, No. 2:15-CV-507-WKW, 2015 WL

4605755, at *1 (M.D. Ala. July 30, 2015). On that basis alone, dismissal of the §
1983 due process claims against all Plaintiffs except Bennett is required.[9]

And as to Bennett, Defendants note that Bennett did not get a conference with
the Board because she was internally reassigned within the same school and the
Students First Act only created conference rights to those employees who were to
be transferred outside the high school feeder pattern. *See* Ala. Code § 16-24C-7(c).
Bennett is therefore foreclosed from bringing a procedural due process claim since
the Students First Act did not give her a right to appeal or formally challenge her
intra-school reassignment. She even concedes that, under the Students First Act,
reassignments such as hers are not subject to review, opting to implore the Court to
consider her internal reassignment as a loss of employment instead. (Doc. 183-1 at
54.) The Court declines Bennett's request to essentially rewrite the Students First
Act.

---

[9] Moore and Thornton contend that they were deprived of the required hearing because they were
only given 10-minute conferences with the Board and were not allowed to cross-examine the
superintendent, call witnesses, or question the board members. But in making these allegations, as
Defendants point out, neither Moore nor Thornton points to any statute that permits these
procedures at the initial meeting with the school board. In other words, as Defendants put it, Moore
and Thornton were given all the process that they were due. Because Moore and Thornton cannot
point to a source of law giving them longer initial conferences, or the ability to cross-examine at
the initial hearing, and neither brings a facial challenge to the Students First Act on due process
grounds, they cannot now prevail on a procedural due process claim. *See Bishop v. Wood*, 426
U.S. 341, 344 (1976); *Warren v. Crawford*, 927 F.2d 559, 562 (11th Cir. 1991).

At bottom, no Plaintiff has shown any deprivation of a procedural safeguard, right, or remedy. From all that appears, Plaintiffs simply disagree with the outcome of their protests to their reassignments and transfers. Their unsubstantiated assertions of procedural due process violations find no support under Count VII. Accordingly, individual defendants are entitled to qualified immunity, and summary judgment is due to be granted as to Count VII.

## F. Section 1983 Equal Protection Claims Against the Individual Defendants

In Count VIII, to the extent Plaintiffs bring 14th Amendment equal protection claims against the board members in their individual and official capacities and the superintendent in his official capacity, those claims fail.

First, similar to the Title VII claims, official capacity claims can only be advanced against the Board, who is the employer, and therefore the Board is the proper defendant for these claims. *See Reeves v. Wilbanks*, 542 F. App'x 742, 745 (11th Cir. 2013) (per curiam); *Welch v. Laney,* 57 F.3d 1004, 1009 (11th Cir. 1995). Summary judgment is therefore due to be granted in favor of the individual defendants, including the superintendent, in their official capacities for the claims asserted in Count VIII.

Second, as to the individual capacity claims in Count VIII, the school board members argue once again that they are shielded by qualified immunity. As with the alleged due process violations, it is clear the board members were acting within

the scope of their discretionary authority because it is only by virtue of their positions as school board members that they were tasked with considering and voting on the employment transfers at issue. It is also clear that the Plaintiffs have not shown that Defendants violated a constitutional right; and more specifically, that Defendants acted with discriminatory intent, a necessary element of an equal protection constitutional violation. *See Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995) (holding that to establish a violation of the Equal Protection Clause, discriminatory motive or purpose of the actor must be proven); *see also Edwards v. Wallace Cmty. Coll.,* 49 F.3d 1517, 1524 (11th Cir. 1995) ("Where, as here, discriminatory intent is an element of a cause of action, it is plaintiff's burden to come forward with concrete evidence of such intent."); *Cason Enter., Inc. v. Metro. Dade Cnty*., 20 F. Supp. 2d 1331, 1341 (S.D. Fla. 1998) ("Stated otherwise, plaintiff must present direct evidence that the officials' actions were improperly motivated by racial discrimination when the officials have asserted qualified immunity as a defense."). Conclusory allegations of discriminatory intent do not suffice.

Moreover, even if Plaintiffs had presented evidence that Strycker had a discriminatory intent, his intent would not impute liability to the board members if they were unaware of such intent when voting on the personnel moves. *See Edwards*, 49 F.3d at 1524 ("[P]laintiff must present direct evidence that the officials' actions

were improperly motivated by racial discrimination when the officials have asserted qualified immunity as a defense"); *Cason Enter., Inc.*, 20 F. Supp. 2d at 1341 ("As discussed above, plaintiffs have not presented any concrete evidence of discriminatory intent on the part [of] any one of the individual defendants.").

Simply put, Plaintiffs bring no direct evidence showing that the board members violated an equal protection right in voting on the transfers. Indeed, Plaintiffs do not even identify and separate which board members they bring a claim against and for which particular transfers—which itself is sufficient reason to grant summary judgment against them. The individual board members therefore are entitled to qualified immunity for the § 1983 equal protection claim against them in their individual capacities (Count VIII), and summary judgment is due to be granted in their favor.

### G. Section 1983 Equal Protection Claim Against the Board

The Board also seeks summary judgment as to the equal protection claim asserted against it in Count VIII, which seeks to hold the Board liable under § 1983 for alleged equal protection violations during the Board's May 15 and 31, 2018 meetings on the transfers.

In order "to impose § 1983 liability on [an entity], a plaintiff must show that: (1) [her] constitutional rights were violated; (2) the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that

the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). *See Bd. of Cnty. Comm'rs of Brayn Cnty. v. Brown*, 520 U.S. 397, 404, 410 (1997) (finding that it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality because plaintiff must also allege that the entity acted with deliberate indifference to her equal protection rights, which requires proof that a municipal actor disregarded a known or obvious consequence of his action). This standard for a municipal entity has been applied to school boards and systems. *See Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 966 (11th Cir. 2002) (applying 1983 municipal liability standard to the school board); *Weissenbach*, 2018 WL 5848047, at *9 (applying standard to county school system).

Plaintiffs have failed to satisfy the standards for imputing liability against a governmental entity for an equal protection violation.  They fail to show that the Board had a custom or policy that constituted deliberate indifference to the right to be free from racially discriminatory transfers, let alone that such a policy or custom caused the violation.  Meanwhile, the Board has presented official policies prohibiting discrimination.[10]  Indeed, Plaintiffs do not dispute the existence or

---

[10] Although the Supreme Court has held that "the failure to train" employees could itself constitute a governmental "policy" or "custom" for which a local government could be liable if the failure to train evidenced "deliberate indifference" to the constitutional rights of those with whom government employees came in contact, that is not the case here because Plaintiffs make no specific allegations about where more training is needed and how it could prevent the violation of constitutional rights. *See City of Canton v. Harris*¸ 489 U.S. 378, 388–89 (1989). Instead, Plaintiffs only state that supervisors should have been trained in the areas of "discrimination and staffing." (Doc. 179 at 210.) That is insufficient, as Plaintiffs have failed to show that the Board "knew of a

application of these policies, nor do they present any evidence of a policy or custom of racial discrimination when selecting employees for transfers that caused Plaintiffs' alleged harms. *See Weissenbach*, 2018 WL 5848047, at *9–10. Instead, they generally argue the irrelevant points that the ignorance of some school board members about a consent decree from a long-ago case and district policies to diversify hiring in certain schools constitutes deliberate indifference to the equal protection rights of the Plaintiffs in this case. This roundabout argument is insufficient to meet the stringent standard of fault necessary here.

Ordinarily, a local government body can also be held liable for a single act or decision of an official with final policymaking authority in the area of the act or decision. *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 968 (11th Cir. 2002). But § 1983 liability cannot be established based on a subordinate official's decisions if the final policymaking body had the right to exercise its own discretion. *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997). A government employee is a final policymaker "only if his decisions have legal effect without

---

need to train and/or supervise in a particular area . . . and made a deliberate choice not to take any action." *O'Kelley v. Craig*, 781 F. App'x 888, 899 (11th Cir. 2019) (holding that simply alleging that training policies were inadequate with no allegations of any specifics of current training or whether the decisionmaker was aware of any similar prior incidents was insufficient). *See also Martin v. Wood*, 648 F. App'x 911, 916 (11th Cir. 2016) ("His complaint contained only the most conclusory allegations that his purported constitutional injuries occurred as a result of the Department's customs and policies or, in the alternative, its failure to train its employees. Labels and conclusions are insufficient to state a claim for relief.").

further action by the governing body and if the governing body lacks the power to reverse the . . . employee's decision." *Holloman ex rel. Holloman*, 370 F.3d at 1292. When a school board can reverse a decision, there is meaningful review. *See Denno v. Sch. Bd. of Volusia Cnty.*, 218 F.3d 1267, 1277 (11th Cir. 2000) (finding principal not to be final policymaker where school board had grievance procedure by which students could take concerns up the chain from the principal to the superintendent and eventually to the school board); Ala. Code § 16-24C-7(c) (explaining that under Alabama law, the school board has final decision-making authority with respect to employment matters). Since the Board is the final decisionmaker here, it cannot be liable for Strycker's actions to the extent Plaintiffs make such an assertion.[11]

---

[11] Plaintiffs attempt to assert cat's paw liability to the Board for allegedly rubberstamping Strycker's decisions. *See Llampallas v. Mini–Circuits, Lab, Inc.,* 163 F.3d 1236, 1249 (11th Cir. 1998) (holding that under a cat's paw theory, a non-decision making employee's discriminatory animus may be imputed to a neutral decisionmaker when the decisionmaker has not independently investigated allegations of misconduct). However, as Defendants argue, a governmental entity can be found liable under § 1983 only where the entity itself causes the constitutional violation at issue and therefore respondeat superior or vicarious liability will not attach under § 1983. Although the Eleventh Circuit has not yet spoken on this issue, the Court is persuaded by nonbinding precedent. *See Harper v. Houston Cnty. Bd. of Educ.*, No. 1:17-CV-721-ALB, 2019 WL 3072631, at *7 (M.D. Ala. July 12, 2019) (discussing the inapplicability of the cat's paw theory in § 1983 litigation and granting summary judgment to defendant school board because plaintiff presented no evidence of an unconstitutional policy or custom of the Board); *Jackson v. City of Centreville*, 899 F. Supp. 2d 1209, 1222 (N.D. Ala. 2012); *see also Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) ("Imputing a non-decision-maker's motive to a municipal employer sounds a lot like respondeat superior liability; given that well-developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the "cat's paw" concept in this area of civil rights law). Moreover, Plaintiffs also cannot show that the Board as a whole merely rubberstamped Strycker's recommendations. Indeed, as Plaintiffs concede, two of the votes were narrow 3 to 2 decisions, suggesting the opposite.

There being no grounds to impute § 1983 liability to the Board, the Court concludes that the Board is entitled to summary judgment on Count VIII.

## VII.  CONCLUSION

It is therefore **ORDERED** as follows:

(1)     Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Joseph West (Doc. 148), Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Margaret West (Doc. 149), Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Regina Bennett (Doc. 150), Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Willie Thornton (Doc. 151), and Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Lenicki Moore (Doc. 152) are GRANTED.  Joseph West, Margaret West, Regina Bennett, Willie Thornton, and Lenicki Moore are terminated as plaintiffs in this action.

(2)     Defendants' Joint Motion for Summary Judgment as Relates to Plaintiff Shawnda Bell (Doc. 153) is GRANTED in part and DENIED in part. Summary Judgment as to Count III against the Board is DENIED. In all other respects, the Motion is GRANTED.

(3)     Plaintiffs' Motion to Strike Marlow's Affidavit (Doc. 172) is DENIED as moot.

(4)     Defendants' Motion to Strike the Declaration of Jennifer Burt (Doc. 222) is DENIED as moot.

(5)     The Motion for Leave to File Surreply by Regina Bennett (Doc. 231) is GRANTED, and the Surreply (Doc. 231-1) is ACCEPTED AS FILED.

(6)     This case shall proceed to trial on Count III as to Plaintiff Shawnda Bell's Title VII claim for race discrimination against the Board. Therefore, all parties are dismissed except for Plaintiff Shawnda Bell and Defendant Butler County Board of Education.

**DONE**, on this the 11th day of July, 2022.

_____/s/ R. Austin Huffaker, Jr._____
R. Austin Huffaker, Jr.
UNITED STATES DISTRICT JUDGE